1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   BLACK LIVES MATTER-STOCKTON              No.  2:18-cv-00591-KJM-AC
     CHAPTER, et al.,
12
                      Plaintiffs,
13                                             ORDER
              v.
14
     SAN JOAQUIN COUNTY SHERIFF'S
15   OFFICE, et al.,

16                    Defendants.

17

18

19              Black Lives Matter Stockton Chapter ("BLM") and several of its members bring

20   this civil rights action and putative class action against San Joaquin County, the San Joaquin

21   County Sheriff's Office, and several individual officers.  Defendants have moved to dismiss the

22   first amended complaint.  Mot., ECF No. 17.  Plaintiffs opposed, ECF No. 26, defendants replied,

23   ECF No. 27, and the court held a hearing on December 7, 2018, ECF No. 29.  As explained

24   below, the court GRANTS defendants' motion in part and DENIES it in part.

25   I.      BACKGROUND

26              On March 7, 2017, plaintiffs Lareesha Brown, Kenneth Marbley and three others

27   were arrested at a BLM protest in Stockton and eventually charged with state criminal

28   misdemeanor charges of assaulting officers and resisting arrest.  First Am. Compl. (FAC), ECF

No. 16, ¶ 33.  On October 30, 2017, a discovery motion related to the five BLM members' cases was heard before Judge Bernard J. Garber at the San Joaquin County Superior Court.  *Id.*  ¶¶ 35, 39.  BLM organized "court support" for the October 30 hearing, meaning that it organized BLM members to attend the hearing, dressed in ways that identified them as BLM members.  *Id.* ¶¶ 38–39.  When BLM members, including the plaintiffs in this case, attempted to enter the courthouse to attend the hearing, San Joaquin County sheriff's deputies controlled the entrance to the courthouse.  *See id.* ¶ 42.  Allegedly, the officers questioned and denied entrance to individuals who are black and brown, and to BLM members specifically, while allowing white individuals unfettered entrance.  *Id.* ¶ 43.  On January 29, 2018, after a hearing on another related motion, a group of sheriff's deputies allegedly followed, insulted, harassed and intimidated BLM members inside the courthouse, implying BLM members were not welcome and would be subjected to violence and arrest if they did not leave.  *Id.* ¶¶ 44–46.

BLM and its founding member Dionne Smith-Downs sued the County, the sheriff, and several individual sheriff's deputies for violating their civil rights under federal and state law.  Compl., ECF No. 1.  Defendants moved to dismiss each of the claims in the original complaint, ECF No. 4, plaintiffs opposed, ECF No, 6, and defendants replied, ECF No. 7.  After a hearing on May 18, 2018, the court granted defendants' motion and dismissed the complaint with leave to amend.  Order, ECF No. 15.  Plaintiffs filed their first amended complaint on August 13, 2018, identifying Denise Friday, Lareesha Brown and Kenneth Marbley[1] as plaintiffs, in addition to BLM and Smith-Downs.  *See generally* FAC.

In the FAC, plaintiffs allege violations of federal constitutional rights under 42 U.S.C. § 1983.[2]  Specifically, they assert claims under the First Amendment, providing the

---

[1] Plaintiffs have since filed a stipulation to dismiss plaintiff Kenneth Marbley under Rule 41(a)(ii), ECF No. 52, but the court denied the stipulation as procedurally improper, ECF No. 54.

[2] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983.

right to free speech and association (Claim 1); the Sixth Amendment, establishing the right to a

public trial (Claim 2); and the Fourteenth Amendment, providing rights of due process (Claim 3).

*See* FAC ¶¶ 70–82.  Plaintiffs also assert two state civil rights claims under the Act, California

Civil Code § 51.7 (Claim 4), and the Bane Act, California Civil Code § 52.1 (Claim 5).[3]  *Id.*

¶¶ 83–86.  Finally, they bring a negligence claim (Claim 6).  *Id.* ¶¶ 87–89.  Plaintiffs ask the court

to certify as a class the members and supporters of BLM, make findings of fact reflecting

defendants' violations of plaintiffs' rights, grant preliminary and permanent injunctive relief,

award compensatory damages, and award punitive damages against the individual defendants.  *Id.*

at 31–32.  All claims are pled against all defendants, without differentiation.

## II.     LEGAL STANDARD

A party may move to dismiss for "failure to state a claim upon which relief can be

granted."  Fed. R. Civ. P. 12(b)(6).  The court may grant the motion only if the complaint lacks a

"cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.

*Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation

omitted).  A complaint must contain a "short and plain statement of the claim showing that the

pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), though it need not include "detailed factual

allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  But "sufficient factual

matter" must make the claim at least plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(citation omitted).  Conclusory or formulaic recitations of elements do not alone suffice.  *Id.*

(citing *Twombly*, 550 U.S. at 555).  In a Rule 12(b)(6) analysis, the court must accept well-pled

factual allegations as true and construe the complaint in plaintiff's favor.  *Erickson v. Pardus*, 551

U.S. 89, 93–94 (2007) (citing *Bell Atl. Corp.*, 550 U.S. at 555–56).

---

[3] Though courts often refer to Ralph Act claims and Bane Act claims as Unruh Act claims, they are based on distinct sections of the California code.  *See Stamps v. Superior Court*, 136 Cal. App. 4th 1441, 1452 (2006) ("By its own terms, the Unruh Civil Rights Act comprises *only* [Cal. Civ. Code] section 51.") (citing Cal. Civ. Code § 51 (Unruh Act); Cal. Civ. Code § 51.7 (Ralph Act); Cal. Civ. Code § 52.1 (Bane Act)).  The court here references cases discussing Unruh Act claims where those cases are still applicable here.

If a plaintiff requests leave to amend a claim subject to dismissal, the federal rules mandate that leave "be freely given when justice so requires." Fed. R. Civ. P. 15(a). Before granting leave, a court considers any potential bad faith, delay, or futility regarding the proposed amendment, and the potential prejudice to the opposing party. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

III.     ELEVENT AMENDMENT IMMUNITY

A.     Official-capacity Claims for Damages

"Under the Eleventh Amendment, agencies of the state are immune from private damage actions or suits for injunctive relief brought in federal court." *Mitchell v. Los Angeles Cty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988) (citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (Eleventh Amendment proscribes suit against state agencies "regardless of the nature of the relief sought")). Because the instant suit is against county actors, not state actors, Eleventh Amendment immunity ordinarily would not apply. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–691 & n.54 (1978). However, when local government units are considered part of the state, they can be entitled to Eleventh Amendment immunity as well. *See Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

To support their argument that court security officers should be considered state actors for purposes of this case, defendants cite *Rojas v. Sonoma Cty.*, No. C-11-1358 EMC, 2011 WL 5024551, at *4 (N.D. Cal. Oct. 21, 2011), in which the court concluded that "sheriffs . . . function as representatives of the state and not the county when providing courtroom security services." In so concluding, the court relied on the fact that, under California Government Code § 77200, the state had sole responsibility for the funding of court operations and, under then-§ 72115, court-related services formerly provided by marshals were provided by sheriffs. *Id.* (citing Cal. Gov't Code § 77200 (West, effective 2009–present) (providing "the state shall assume sole responsibility for the funding of court operations, as defined in Section 77003"); Cal. Gov't Code § 77003(a)(3) (West, effective 2008–2012) (defining court operations to include "[t]hose marshals and sheriffs as the court deems necessary for court operations"); Cal. Gov't Code § 72115(a) (West, effective 2003–2017) (repealed by Stats. 2002, c. 784 (S.B.1316) § 370,

4

effective Jan. 1, 2018) (referring to "abolition of the marshal's office and the transfer of court-related services provided by the marshal within the county to the sheriff's department")).

Plaintiffs argue *Rojas* is no longer good law, because the Superior Court Security Act of 2012 shifted the funding of court security from the state to the counties, thereby either repealing or significantly amending the statutes relied upon by the court in *Rojas*. Opp'n at 4 (citing Cal. Gov't Code §69920 *et seq.*); *see also* A.B. 118, 2011–2012 Reg. Sess. Legis. Serv. (Ca. 2011) (amending, *inter alia*, Cal. Gov't Code § 30025, creating the "Trial Court Security Account" within the Local Revenue Fund 2011, and requiring county treasurer to create a "Trial Court Security Account" to "be used exclusively to fund trial court security provided by county sheriffs").[4]

Only one sister court has addressed this issue since the 2012 amendments to the statutes relied upon in *Rojas*. *See Hiramanek v. Clark*, No. C-13-0228 EMC, 2013 WL 4734025, at *4 (N.D. Cal. Sept. 3, 2013) ("Order Re Plaintiffs' Amended Complaint"); *Hiramanek v. Clark*, No. 13-00228, 2014 WL 2855512, at *6 (N.D. Cal. June 20, 2014) ("Order Granting in Part Motion to Amend"). In both *Hiramanek* decisions*,* the court held that court security officers are state actors and cited only to *Rojas*, without any mention of the statutory changes. *Hiramanek*, 2013 WL 4734025, at *4; *Hiramanek*, 2014 WL 2855512, at *6. Because of the statutory changes, this court declines to rely on *Rojas*, but rather conducts its own analysis, and concludes as explained below, that, in San Joaquin County, sheriffs and sheriff's deputies are state actors when providing court security to the Superior Court.

### 1. Supreme Court's *McMillian* Decision

In *McMillian*, the United States Supreme Court directed courts to analyze state law to determine "the actual function of a governmental official, in a particular area." *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 786 (1997). In conducting this functional analysis, the court in that case rejected plaintiff's argument that the sheriffs were county actors because their salaries

---

[4] California Government Code section 30025 has been amended frequently. Nonetheless, as relevant to the issues here, the framework has remained substantively the same between 2011 and 2018.

were paid by the county: "The county's payment of the sheriff's salary does not translate into control over him, since the county neither has the authority to change his salary nor the discretion to refuse payment completely. The county commissions do appear to have the discretion to deny funds to the sheriffs for their operations beyond what is 'reasonably necessary.' But at most, this discretion would allow the commission to exert an attenuated and indirect influence over the sheriff's operations." *McMillian*, 520 U.S. at 791–92 (citation omitted). Instead, the Court held that sheriffs were state actors under Alabama law, because they were controlled primarily by state officials. *Id.* at 791–93.

This holding regarding which entity "controlled" the sheriffs turned on several aspects of Alabama state law. First, it relied on the fact that the Alabama Constitution provided for sheriffs as part of the executive department of the state. *Id.* at 787 (citing Ala. Const. of 1901, Art. V, § 112). The state constitution also made sheriffs impeachable by the State Supreme Court, at the direction of the Governor, meaning sheriffs shared the same impeachment procedures as state legal officers and judges rather than county and municipal officers. *Id.* at 788 (citing Ala. Const. of 1901, Art. VII, § 174; Ala. Const. of 1875, Art. VII, § 3). Second, by statute, sheriffs were required to carry out orders from state court judges, even those outside the sheriff's county, and the presiding circuit judge exercised general supervision over county sheriffs. *Id.* at 789–90 (citing Ala. Code §§ 36-22-3(1), (2) (1991); Ala. Code § 12-17-24 (1995)).[5] Most importantly, Alabama law gave sheriffs "complete authority to enforce the state criminal law in their counties," a power which the County wholly lacked. *Id.* at 790 (citing Ala. Code § 36–22–3(4), § 11–3–11 (1989). Thus, the County lacked the authority to tell the sheriff how to carry out his law enforcement duties. *McMillian*, 520 U.S. at 790. And, ultimately, the sheriff was required to share criminal evidence he obtained with the district attorney, a state official, and not with the County. *Id.* (citing *Hooks v. Hitt*, 539 So. 2d 157, 159 (Ala. 1988)).

---

[5] The Court also pointed out that, while sheriffs had to report to the county treasurer regarding funds received for the county, the county treasurer did not have any authority to direct the sheriff to take specific actions. *McMillian*, 520 U.S. at 790.

1  Finally, although the sheriff's salary was paid out of the county treasury, the salaries of all

2  sheriffs were set by the state legislature, not the county. *Id.* at 791 (citing Ala. Code § 36–22–16).

3                           2.        Federal Courts Applying *McMillian*

4              Before the 2012 amendments to the California statutes implicated here, the

5  Central District applied *McMillian*'s reasoning to a sheriff's role in providing court security.

6  *Hawkins v. Comparet-Cassani*, 33 F. Supp. 2d 1244, 1253 (C.D. Cal. 1999), *opinion modified on*

7  *reconsideration* (Feb. 5, 1999), *rev'd in part on other grounds*, 251 F.3d 1230 (9th Cir. 2001).

8  The court did not mention the source of the sheriff's funding, but rather alluded to the fact that

9  district attorneys, who are state actors, and sheriffs are both under the direct supervision of the

10  Attorney General, a state official. *Id.* (citing Cal. Const. art. V, § 13; Cal. Gov. Code § 12550;

11  Cal. Penal Code § 923; *Pitts v. County of Kern,* 17 Cal. 4th 340 (Cal. 1998)).  The *Hawkins* court

12  also added, "here the Sheriff was providing security to a state court at the time of the incident. . . .

13  [and] municipal and superior courts are instruments of the State and are exempt from suit in

14  federal courts by the Eleventh Amendment." *Id.*  Therefore, the court found, "in light of *Pitts* and

15  given the activities in which the Sheriff was engaged at the time of the incident, a California court

16  would find that the Sheriff was acting as a state rather than a county policymaker." *Id.*  This

17  reasoning, based on the role of the Sheriff as subordinate to the Attorney General and the role of

18  courts as instruments of the State, holds true even after the 2012 amendments to the law

19  governing the Sheriff's funding structure.

20                           3.        California State Law

21              The court also looks to California state law for guidance with respect to the

22  functional role of court security officers. *See McMillian*, 520 U.S. at 786.  Plaintiffs emphasize

23  the importance of the Superior Court Security Act of 2012, which provides a framework for

24  sheriffs and courts to work together to plan for court security. *See* Opp'n at 4 (citing Cal. Gov't

25  Code §69920 *et seq*.).  Under this framework, the sheriff is directed to enter into a memorandum

26  of understanding with the Superior Courts, "on behalf of the county" and "with the approval and

27  authorization of the board of supervisors," laying out a plan for the provision of court security

28  services for the Superior Courts.  Cal. Gov't Code § 69926(b).  The statute provides for  a

process of negotiation in the event the Superior Court and the sheriff are unable to reach a timely agreement. *Id.* § 69926(c)–(d). "Any recommended resolution" that comes out of this negotiation process, "shall be approved by the board of supervisors, consistent with subdivision (b)." *Id.* § 69926(d).[6] While this framework primarily dictates collaboration between the sheriff and the courts in planning for court security, it gives the ultimate power to the board of supervisors, which is a County entity. As such, it counsels in favor of treating court security officers as County actors.[7]

However, with respect to San Joaquin County specifically, a statute tailored to the County ultimately leads to the opposite conclusion. The California Government Code creates a division within the San Joaquin County Sheriff's Department to provide security for the Superior Court, named the "court services division." Cal. Gov't Code §§ 74820.2–3 The sheriff has authority to staff the division,[8] but "the selection, appointment, and removal of the chiefs of the court services division shall be made by a majority vote of the incumbent superior court judges and commissioners from a list of qualified candidates submitted by a committee comprised of the sheriff and an incumbent judge of the superior court." *Id.* § 74820.3. In other words, while the sheriff is responsible for the staffing of court security officers, the chief of the court services

---

[6] Technically, the process does not end there. Should any disputes remain unresolved after this process, a dispute-resolution process ensues, designed by the Judicial Council, in which a justice from outside the county hears and decides the dispute, which can then be appealed to a court of appeal other than the one in which the county and superior court are located. *Id.* § 69926(e)–(f). In this role, the court is acting as a neutral third party, not as a stakeholder, so it cannot be said that the court, rather than the County, has the ultimate authority over the provision of services.

[7] The Superior Court Security Act also contains a provision similar to the Alabama code analyzed by the *McMillian* Court; it states: "The sheriff shall obey all lawful orders and directions of all courts held within his or her county." Cal. Gov't Code 69922(a). Like the Alabama code, this makes sheriffs subject to the authority of state court judges; however, unlike the Alabama code, the California code's reach is limited to the sheriff's own county. *See McMillian*, 520 U.S. at 789–90 (citing Ala. Code §§ 36–22–3(1), (2) (1991)). The court finds that, on balance, this factor neither supports nor controverts the finding that San Joaquin County court security officers are state actors.

[8] The text of the statute reads: "The sheriff shall be the appointing authority for all court services division positions and employees."

division is effectively controlled by the superior court judges and commissioners.   This puts the court services division in San Joaquin County ultimately under the control of the Superior Court, which is an arm of the state, *see Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1110 (9th Cir. 1987), *superseded by statute on other grounds*.

### 4.    Conclusion

The conclusion reached in *Rojas*, albeit prior to the 2012 statutory amendments, remains sound when applied to San Joaquin County.  When San Joaquin County sheriffs are providing court security to the Superior Court, they are acting as state employees.  As state actors, they are immune from suit for damages against them in their official capacities by virtue of the Eleventh Amendment, because such a suit is essentially a suit for damages against the state.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.") (citation omitted).

Accordingly, the Eleventh Amendment bars plaintiffs' federal and state law claims[9] for damages against any defendant sued in his or her official capacity; here the defendant protected by immunity is defendant Moore.[10]  All claims in the first amended complaint stem from the defendant sheriffs' actions while they were providing security services for the San Joaquin County Superior Courthouse on October 30, 2017 and January 29, 2018.  *See* FAC ¶¶ 39, 42–47.  Plaintiffs have not pled any facts to suggest defendants were acting outside the scope of

---

[9] Though defendants do not argue in their briefing that Eleventh Amendment immunity bars plaintiffs' state law claims, both parties agreed at hearing that the immunity applies to both state and federal claims.  The court agrees.  *See Corales v. Bennett*, 567 F.3d 554, 573 (9th Cir. 2009) (affirming district court ruling that "state civil rights claims" against state entity, including § 51.7 and § 52.1 claims, are barred by Eleventh Amendment immunity) (citing *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006) (explaining Unruh Act does not effectuate consent to federal court actions)).

[10] It is not clear from the complaint whether the individual defendants are being sued both in their official capacities and in their individual capacities; the complaint clarifies only with respect to defendant Sheriff Moore who "is sued in his official capacity only."  FAC ¶ 23.  However, plaintiffs clarified at hearing that defendants Petrino and Oliver are only being sued in their individual capacity.  Therefore, Moore is the only individual defendant being sued in his official capacity.

9

their role as courtroom security during these incidents. Plaintiffs have already amended their complaint once after the court dismissed this claim, *inter alia*, *see* Order, ECF No. 15, and they have given no indication this deficiency can be cured by another amendment. Accordingly, plaintiffs' § 1983 claims against Moore are DISMISSED with prejudice. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (citing "repeated failure to cure deficiencies by amendments previously allowed" and "futility of amendment" as reasons to why leave to amend may be denied); *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990) (dismissal with prejudice not abuse of discretion if amendment would be futile).

The same reasoning applies to the San Joaquin County Sheriff's Department and San Joaquin County, because all claims against them arise out of defendants' conduct as state actors. *Boakye-Yiadom v. City, Cty. of San Francisco*, No. C-99-0873 VRW, 1999 WL 638260, at *2–3 (N.D. Cal. Aug. 18, 1999) ("If the San Francisco Sheriff's Department was acting as a representative of the State of California, rather than the City and County of San Francisco, in taking the actions plaintiff complains of, then it too is immune from suit under section 1983.") (citing *McMillian*, 520 U.S. at 781). Accordingly, the court need not reach the issue of whether plaintiffs have adequately pled *Monell* liability, which would allow plaintiffs to hold the County liable for the actions of defendants if those actions constitute County "policy." *See* Mot. at 15–17 (citing *Monell*, 436 U.S at 692); *see also McMillian*, 520 U.S. at 783; *Rojas v. Sonoma Cty.*, 2011 WL 5024551, at *4 (finding that, because defendant deputy "was acting as a representative of the state, and not the County, there are no factual allegations to support a § 1983 claim against the County. The Court therefore dismisses the § 1983 claim against the County on that basis, without entertaining the parties' dispute over . . . municipal liability . . . .").

Therefore, all of plaintiffs' claims for damages against the San Joaquin County Sheriff's Department and San Joaquin County are DISMISSED with prejudice as barred by the Eleventh Amendment. *See Foman v. Davis*, 371 U.S. at 182; *Reddy v. Litton Indus., Inc.*, 912 F.2d at 296.

B.    Claims for Declaratory Relief

When a claim against a state for declaratory relief relates "solely to past violations of federal law," it is barred by the Eleventh Amendment in the same way as a claim for damages is barred. *Green v. Mansour*, 474 U.S. 64, 73 (1985) (declaratory relief regarding past violations of federal law prohibited under Eleventh Amendment where it would have essentially same effect as damages award due to its res judicata implications in state court). Therefore, to the extent plaintiffs' claims are for declaratory relief, they are DISMISSED.

C.    Official-capacity § 1983 Claims for Prospective Injunctive Relief

The *Ex parte Young* doctrine provides a narrow exception to Eleventh Amendment immunity for "prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law." *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (citing *Alden v. Maine*, 527 U.S. at 747; *Ex parte Young*, 209 U.S. 123, 155–56 (1907)). For the exception to apply, it must be clear "that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party." *Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998). "This connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

Plaintiffs have sufficiently pled a causal connection between defendant Moore and the purported constitutional violations that arise out of the October 30, 2017 incidents, for the purpose of *Ex parte Young*. Plaintiffs claim that defendant Moore "caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal . . . practices that prevailed[ed] at the San Joaquin County Courthouse, as described [elsewhere in the complaint]." FAC ¶ 23. To support this conclusion, plaintiffs plead that "[t]he spokesperson for the Sheriff's Office publicly acknowledged that the Sheriff's Office is responsible for making security decisions at the courthouse, and on October 30, 2017, implemented the decision to exclude plaintiffs and the court supporters for BLM-Stockton." *Id.* ¶ 49. As the Sheriff of the County of

San Joaquin, this statement could fairly be read to mean that defendant Moore, in his official capacity, implemented the decision to exclude plaintiffs and court supporters for BLM. Drawing all reasonable inferences in the plaintiff's favor, as the court is required to do at this stage of the proceedings, the court finds that a causal connection between defendant Moore and the purported constitutional violations is adequately pled. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). Therefore, the § 1983 claims (claims one through three) against defendant Moore for prospective injunctive relief are not barred by the Eleventh Amendment under *Ex parte Young*, 209 U.S. at 155–56.

The *Ex parte Young* doctrine only applies to suits for violations of federal law, not state law. *Steshenko v. Albee*, 42 F. Supp. 3d 1281, 1288 (N.D. Cal. 2014) (*Ex parte Young* doctrine did not exempt from Eleventh Amendment immunity plaintiff's Bane Act claim) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). Therefore, the claims for injunctive relief for the state law claims against defendant Moore are barred by the Eleventh Amendment.

### D. Individual-capacity § 1983 Claims Against Defendants Petrino and Oliver

"[S]tate officials, sued in their individual capacities, are 'persons' within the meaning of § 1983," and "[t]he Eleventh Amendment does not bar such suits." *Hafer v. Melo*, 502 U.S. 21, 31 (1991). "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *accord Monell*, 436 U.S. at 694. Because defendants Petrino and Oliver are only being sued in their individual capacity, the § 1983 claims and state claims against them may proceed if otherwise adequately alleged and if not otherwise barred by another form of immunity, as considered below.

## IV. REMAINING FEDERAL CLAIMS

### A. First Amendment - § 1983 (Claim 1)

Plaintiffs allege all defendants violated their First Amendment rights to freedom of speech and association. FAC ¶ 74. The First Amendment's free speech protections encompass the freedom to engage in "expressive association," which protects a group's right to gather for a

12

particular expressive purpose, such as a protest or parade.  *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995); *cf. Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (explaining group's coming together for different associational purpose, like dancing, does not "involve the sort of expressive association that the First Amendment has been held to protect").

In its August 2, 2018 order, the court found plaintiffs had not pled that they came together on either date identified in the complaint to express a collective viewpoint.  Order, ECF No. 15 at 4.  Plaintiffs have now cured this defect, and plausibly state a claim for a violation of their First Amendment rights of association and public exercise of free speech.  The complaint alleges that, on October 30, plaintiffs were providing "court support," which includes dressing and identifying themselves as BLM members and "wear[ing] earrings or clothing that spell out BLM."  FAC ¶ 38.  The complaint explains that "court support" has an expressive purpose: to "increase[] public awareness and scrutiny of the criminal justice system and the issues which BLM-Stockton Chapter advocates for" and  "communicate[] to the Court, the district attorney and police, as well as members of BLM-Stockton and its supporters that BLM-Stockton's [sic] is serious about its exercise of free speech and that those who support these goals and are arrested during the exercise of free speech activities will be supported through the criminal prosecution process."  *Id.*  In other words, BLM's presence in the courtroom, dressed in clothing identifying membership in BLM, is allegedly intended to express a message to the criminal defendants as well as onlookers and members of the court, in the same way that participants in a parade make "a collective point, not just to each other but to bystanders along the way."  *Hurley,* 515 U.S. at 568; *see also Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) (holding that wearing black armband to school to protest Vietnam War was expressive conduct).  Therefore, when defendants allegedly denied BLM members access to the court because they were affiliated with BLM, and BLM had organized "court support" for that day, defendants could plausibly have violated plaintiffs First Amendment rights to free expression and association.

Thus, defendants San Joaquin County, Steve Moore, Dave Oliver and Joe Petrino's motion to dismiss as to plaintiffs' First Amendment claims for: (1) damages against

defendants Oliver and Petrino in their individual capacity, and (2) prospective injunctive relief against all individual defendants is DENIED.

## B. Sixth Amendment - § 1983 (Claim 2)

Plaintiffs claim defendants collectively denied plaintiffs' Sixth Amendment right to a public trial, a right shared by the accused and the public. FAC ¶¶ 77–78. In its August 2 order, the court found plaintiffs lacked standing to bring this claim, as pled. To establish standing, plaintiffs must plead facts showing (1) an injury in fact; (2) a causal link between defendants' conduct and the claimed injury; and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The alleged injury must be concrete, not abstract or hypothetical. *Id.* Plaintiffs have adequately pled individual standing as to plaintiffs Marbley and Brown and associational standing as to BLM as well, as explained below.

### 1. Individual Standing

Plaintiffs now include Lareesha Brown and Kenneth Marbley ("criminal defendant plaintiffs"), who were arrested and charged with crimes related to their participation in the BLM protest on March 7, 2017. FAC ¶¶ 33–34. According to the complaint, the hearing on October 30 was on the subject of a discovery dispute that related to both Brown's and Marbley's cases. *Id.* ¶¶ 35, 39. Plaintiffs do not allege that any of the criminal defendant plaintiffs required or planning to attend either of the hearings were actually denied entry to the courthouse.[11] *See* Mot. at 19; FAC ¶¶ 24–25. Rather, according to the complaint, only members of the public were denied access to the courthouse. *Id.* Therefore, the individual plaintiffs' standing turns on (1) whether members of the public have a Sixth Amendment right to enter a courthouse to view a hearing, and (2) whether criminal defendants' "public-trial guarantee" gives them a right to have all members of the public who wish to attend present at their hearings.

---

[11] At the hearing, plaintiffs' counsel explained that Brown and Marbley were both prevented from entering the courthouse for so long that they missed their own hearings. Though this is not alleged in the complaint, it does not change the analysis here, because the court finds the criminal defendant plaintiffs have adequately pled a Sixth Amendment violation based on the alleged limited closure of the courthouse.

14

As to the first question, the press and general public have a qualified First Amendment right of access to criminal trials. *See Waller v. Georgia*, 467 U.S. 39, 44–45 (1984) (citing *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (plurality opinion)). However, the Sixth Amendment right to a public trial belongs to the criminal defendant, not the public. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 379–80 (1979) ("Our cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant"). Therefore, the plaintiffs who were not criminal defendants with hearings in their own cases do not have standing to assert a violation of the Sixth Amendment right to a public trial. *Id.* at 391 ("[M]embers of the public have no constitutional right under the Sixth and Fourteenth Amendments to attend criminal trials."); *but see id.* at 406 (1979) (Blackmun, J., joined by Brennan, White, and Marshall, JJ., dissenting in part) (arguing that "the Sixth Amendment may implicate interests beyond those of the accused").

As to the second question, a criminal defendant does have a Sixth Amendment qualified right to a public trial, which extends to certain pre-trial hearings. *Waller v. Georgia*, 467 U.S. 39, 47 (1984) (recognizing a qualified right, under the Sixth Amendment, of a criminal defendant to have the public present during a suppression hearing). The hearing at issue here was not a suppression hearing, as in *Waller*, but was on defendants' motion to compel discovery in support of their motion to recuse the San Joaquin County District Attorney's Office from the case. Compl. ¶ 35. In some ways, this type of hearing is unlike the suppression hearing at issue in *Waller*, because it unlikely to result in a bench-trial-like proceeding "as important as the trial itself." *Waller*, 476 U.S. at 46–47 (discussing how the miniature trial nature of a suppression hearing implicates values protected by right to a public trial); *Nolan v. Money*, No. 1:07CV3077, 2011 WL 219911, at *13 (N.D. Ohio Jan. 21, 2011) ("[T]he fact that this hearing was for the purpose of discovery weighs against finding a violation of Nolan's right to a public trial was violated.") (citing Waller, 467 U.S. at 47), *aff'd*, 534 F. App'x 373 (6th Cir. 2013). Nonetheless, the *Waller* court also based its holding on the fact that the nature of a suppression hearing made "the need for an open proceeding . . . particularly strong," because, "[a] challenge to the seizure

of evidence frequently attacks the conduct of police and prosecutor. . . . [and] [t]he public in general also has a strong interest in exposing substantial allegations of police misconduct to the salutary effects of public scrutiny." *Waller*, 476 U.S. at 47. According to the complaint, the criminal defendants' motion to recuse similarly involved a challenge to the conduct of the prosecutors and potentially substantial allegations of prosecutor misconduct. *See* Compl. ¶ 35 (motion to recuse based on leaked photographs of San Joaquin District Attorney's office party skit wherein staff members, including attorneys "performed a skit mocking Black Lives Matter"). Accordingly, drawing reasonable inferences in plaintiffs' favor, the motion to compel hearing had enough of the same characteristics as the suppression hearing in *Waller*, such that the qualified Sixth Amendment right to a public trial may have been implicated when members of the public were barred from attending.

Under *Waller* and *Press-Enter. Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501 (1984), when a criminal defendant objects to the closure of the courtroom, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller*, 476 U.S. at 47–48. Defendants argue the criminal defendant plaintiffs' hearings were subject only to a limited closure, which was "justifiable in light of the information that was publicly available prior to both incidents . . . ." Mot. at 20. Whether or not a limited closure was justifiable under the circumstances is a factual question that is not appropriately decided at this stage of the proceedings. *See Bell Atl. Corp. v. Twombly*, 550 U.S. at 555 (in Rule 12(b)(6) analysis, court must accept well-pled factual allegations as true and construe complaint in plaintiff's favor). The complaint alleges that individuals who were "brown or black" were denied entrance to the courthouse on October 30, 2017. FAC ¶ 43. Accepting these facts as true, the court finds that plaintiffs have sufficiently pled a plausible violation of plaintiff Brown's and plaintiff Marbley's Sixth Amendment right to a public trial, and plaintiffs have sufficiently pled standing as to plaintiff Brown and Marbley for this claim.

2.      BLM's Associational Standing

        To assert claims on behalf of its members, BLM must plead facts showing (1) its members "would otherwise have standing to sue in their own right"; (2) the interests BLM seeks to protect are "germane to the organization's purpose"; and (3) individual members' participation in the lawsuit is not required. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In its previous order, the court found BLM did adequately plead the first factor, but did not adequately plead facts showing that "(2) the interests BLM seeks to protect are 'germane to the organization's purpose.'" Order at 4–5. Given its prior order, the court has reviewed plaintiffs' amended pleading, and finds that in the first amended complaint, plaintiffs sufficiently plead both of the first two required elements.

        First, plaintiffs allege that on October 30, defendants denied courthouse access to BLM members and "plaintiffs who are black and brown," including the named plaintiffs, thereby allegedly violating the public trial rights of the criminal defendants whose cases were being heard that day. *See* FAC ¶ 43. For the reasons stated above, this satisfies the first prong, members' standing.

        Second, plaintiffs allege that protecting the plaintiff criminal defendants' Sixth Amendment public trial right is germane to the organization's purpose. The complaint states, "Black Lives Matter-Stockton Chapter considers its court support work essential because BLM-Stockton's presence in the court room [sic] improves racial equality within the criminal justice system and encourages fairer outcomes for these criminal prosecutions of BLM-Stockton protesters by increasing public awareness and scrutiny of the criminal justice system and the issues which BLM-Stockton Chapter advocates for." *Id.* ¶ 38. In other words, plaintiffs allege that having BLM members present in the courtroom to support those charged with crimes related to BLM protests is part of the purpose of BLM. Therefore, protecting the public trial rights of the BLM protesters who were criminally charged is germane to BLM's purpose.

        As to the third factor, nothing in the record before the court suggests any reason the individual plaintiff criminal defendants' participation is required for the claims brought by BLM to proceed.

Accordingly, defendants San Joaquin County, Steve Moore, Dave Oliver and Joe Petrino's motion to dismiss plaintiffs' Sixth Amendment claims for: (1) damages against defendants Oliver and Petrino in their individual capacity, and (2) prospective injunctive relief against all individual defendants is DENIED.

C.    Fourteenth Amendment Due Process - § 1983 (Claim 3)

Plaintiffs allege all defendants violated their rights to due process under the Fourteenth Amendment; specifically, the complaint states that "plaintiffs and proposed sub-class members['] rights to due process through the vigorous and active assertion of their right to mount a defense to the criminal prosecutions." FAC ¶ 81. Plaintiffs' opposition clarifies this claim is for a violation of plaintiffs' substantive due process rights. Opp'n at 13. The doctrine of substantive due process prevents the government from depriving a person of life, liberty, or property in such a way that "shocks the conscience" or "interferes with rights 'implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952); *Palko v. Connecticut*, 302 U.S. 319, 325–26 (1937)).

As to the Fourteenth Amendment,[12] the claim cannot survive dismissal as currently pled, even accepting plaintiffs' clarification that the claim is for substantive due process and can be realleged as such. *See* Opp'n at 13. First, it remains unclear whether the due process allegations pertain only to the October 30 incident, or to the January 29 incident as well. *See* Order at 5; FAC ¶¶ 79–82. Second, a claim for a violation of the due process clause requires an allegation that plaintiff has suffered a deprivation of life, liberty, or property. *See Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) ("To establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government deprivation of life, liberty, or property."

---

[12]  In light of plaintiffs' clarification of their third claim, the court construes it as solely based on the Fourteenth Amendment. To the extent any confusion remains regarding whether plaintiffs have alleged a Fifth Amendment claim, that claim is DISMISSED as plaintiffs have not alleged any federal action. *See* Compl. at 29 ("Third Cause of Action [:] Violation of Fifth Amendment to the United States Constitution Under 42 U.S.C. § 1983"); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001), *abrogated on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002).

(footnote and citation omitted)).  Here, the amended complaint alleges only that plaintiffs have been deprived of the right to "mount a defense to [] criminal prosecutions."  FAC ¶ 81.  Plaintiffs do not plead facts that connect defendants' actions on either October 30 or January 29 to plaintiffs' ability to mount such a defense, notwithstanding plaintiffs' allegations that plaintiffs Brown and Marbley were prevented from attending the October 30 hearing in their criminal cases.[13]  Finally, a claim for substantive due process specifically requires a showing of official conduct that "shocks the conscience" and "offend[s] the community's sense of fair play and decency," *Rochin v. California,* 342 U.S. 165, 172–73 (1952), or "interferes with rights 'implicit in the concept of ordered liberty.'"  *United States v. Salerno,* 481 U.S. 739, 746 (1987) (citations omitted).  Plaintiffs do not plead sufficient facts to meet either of these requirements.  *See, e.g., Marsh v. Cty. of San Diego*, 680 F.3d 1148, 1155 (9th Cir. 2012) (leaking child's autopsy photograph to press causing mother emotional distress without any legitimate governmental purpose shocked conscience); *Brittain v. Hansen*, 451 F.3d 982 (9th Cir. 2006) (affirming grant of summary judgment, in part because police officer's removal of child from non-custodial mother and use of condescending, hostile tone and threats of arrest were not conscience-shocking).

In their opposition, plaintiffs argue the complaint also contains a second due process claim: "the threat of arrest is a threat to liberty, and for African Americans, the threat of arrest is often a threat to life.  This is the claim . . . . under the Fourteenth amendment, which paragraph 80 of the FAC articulates."  Opp'n at 13.  However, even as articulated in the opposition, plaintiffs allege only a "threat" to life or liberty, not a deprivation of either.  While a threat of an injury can be justiciable, it must be "real and immediate."  *Portland Police Ass'n v. City of Portland*, 658 F.2d 1272, 1273 (9th Cir. 1981).  Plaintiffs' claim does not plead the

---

[13] Because it was not raised by the parties, the court declines to reach a conclusion regarding whether these facts could amount to a procedural due process claim.  *See Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) ("[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.").

1   requisite immediacy, as the alleged threat occurred in the past; plaintiffs do not allege there is any

2   ongoing threat to life, liberty, or property.  *See Riddle v. I.R.S.*, No. CV-04-415-ST, 2004 WL

3   1919991, at *4 (D. Or. Aug. 26, 2004) (citations omitted) (plaintiff did not state claim for due

4   process violation because he had not yet suffered any loss of property and failed to allege

5   immediacy or reality of threat).  At hearing, plaintiffs suggested the January 28 episode

6   represented an ongoing threat to plaintiffs, in that defendants caused plaintiffs to fear returning to

7   the courthouse, but the facts remain too vague for the claim to survive dismissal.  Plaintiffs have

8   not pled sufficient facts to support a substantive due process claim.

9          Plaintiffs' Fourteenth Amendment claim is DISMISSED, but with leave to amend

10  to clarify, if plaintiffs are able, their due process claim for damages against the individual-

11  capacity defendants and for prospective injunctive relief against all three individual defendants.

12  V.      STATE CLAIMS (Claims 4–6)

13          A.      Official-Capacity Claims

14          As explained above, plaintiffs' state law claims against defendant Moore do not

15  fall under any exception to the Eleventh Amendment bar against suits brought against the state in

16  federal court.  *See Coal. to Defend Affirmative Action v. Brown*, 674 F.3d at 1134 (*Ex parte*

17  *Young* exception does not apply to state law claims); *Corales v. Bennett*, 567 F.3d 554, 573 (9th

18  Cir. 2009) (affirming district court ruling that "state civil rights claims" against state entity,

19  including Unruh Act claims, are barred by Eleventh Amendment immunity) (citing *Stanley v.*

20  *Trustees of California State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006) (Unruh Act does not

21  effectuate consent to federal court actions)).  Because the claims against Moore are barred by

22  Eleventh Amendment immunity, amending would be futile.  As such, plaintiffs' state law claims

23  against defendant Moore are DISMISSED with prejudice.  *See Foman v. Davis*, 371 U.S. at 182;

24  *Reddy v. Litton Indus., Inc.*, 912 F.2d at 296.

25          B.      Individual-Capacity Claims

26          Because officers Petrino and Oliver and Does 1–50 are sued in their individual

27  capacity, the Eleventh Amendment does not bar the state claims against them in federal court.

28  *See  Alden v. Maine*, 527 U.S. 706, 757 (1999) ("Even a suit for money damages may be

prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally.").  Nevertheless, defendants argue the state claims should be dismissed because plaintiffs fail to state a claim.  The court addresses each of the three state claims below.

### 1.    Claim 4: Ralph Act[14]

Plaintiffs' fourth cause of action arises under California Civil Code § 51.7 (Ralph Act), and alleges that defendants violated plaintiffs' "right to be free from violence and intimidation by threat of violence because of their actual or perceived political affiliation and/or viewpoint . . . ."  Compl. ¶ 84.  The elements of a Ralph Act claim for threatened violence under California law are: (1) The defendant intentionally threatened violence against the plaintiff or her property, whether or not defendant actually intended to carry out the threat; (2) A substantial motivating reason for the defendant's conduct was her perception of the plaintiff's protected characteristic as defined by the statute (including race and political affiliation); (3) A reasonable person in plaintiff's position would have believed that defendant would carry out the threat; (4) A reasonable person in plaintiff's position would have been intimidated by defendant's conduct; (5) Plaintiff was harmed; and (6) Defendant's conduct was a substantial factor in causing the plaintiff's harm.  Judicial Council of California Civil Jury Instruction 3064 (2019); *see also Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 881(2007) (citation omitted).  Defendants argue (1) plaintiffs do not allege defendants threatened or committed violent acts on October 30, 2017, and (2) plaintiffs fail to plead that defendants were motivated by plaintiffs' protected characteristic.  Mot. at 23.

---

[14] "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of [sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status], or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive." Cal. Civ. Code § 51.7(b) (West, 2019).

First, while plaintiffs have not pled that any of the named defendants explicitly threatened or committed violence against them on either of the days in question, *see* FAC ¶¶ 43–45, plaintiffs do plead that, on January 29, unnamed defendants Does 31–50 chased plaintiff Brown and her companions, and engaged in "menacing and threatening conduct, and verbally insulted plaintiff Brown . . . and stated that [she] and her companions had no business at the courthouse and instructed them to leave." FAC ¶ 45. This statement, coupled with the allegation that defendants' conduct caused them to feel "fearful and anxious and concerned for their personal safety," *id.* ¶ 46, is "sufficient factual matter" to make their claim that defendants threatened violence at least "plausible," *Iqbal*, 556 U.S. at 678.

Second, plaintiffs have pled that these defendants were motivated by their affiliation with BLM, a political organization. FAC ¶¶ 29–32 (describing political nature of BLM); ¶¶ 44–45. Political affiliation is a protected characteristic under the Ralph Act. Cal. Civ. Code § 51.7 ("All persons within the jurisdiction of this state have the right to be free from . . . threat of violence . . . because of political affiliation . . . ."). In addition, plaintiffs allege that defendants were motivated by plaintiffs' race, FAC ¶¶ 44–45, which is also a protected characteristic under the Ralph Act. Cal. Civ. Code § 51.7(b).

Therefore, defendants' motion to dismiss plaintiffs' Ralph Act claim is DENIED in part, as to defendants Does 31–50.

As to the other named defendants, defendants argue that, because plaintiffs have not pled any of the named defendants were present during the January 29 incident, and plaintiffs have not adequately pled supervisory liability, the claim against them should be dismissed. "[A] Ralph or Bane Act claim can be asserted against a sheriff based on his or her conduct as a supervisor rather than on personal involvement in violence or a threat of violence against a plaintiff" in the same way as for a § 1983 claim. *Johnson v. Baca*, No. CV1304496MMMAJWX, 2014 WL 12588641, at *16 (C.D. Cal. Mar. 3, 2014) (citations omitted). Therefore, to state a claim against any of the named individual defendants, plaintiffs must allege there exists either (1) defendants were personally involved in the constitutional deprivation, or (2) a sufficient causal connection between defendant's wrongful conduct and the constitutional violation. *Starr v. Baca*,

652 F.3d 1202, 1207 (9th Cir. 2011).  Plaintiffs do not plead facts to suggest Petrino and Oliver

were in any way involved with the January 29 incident.  *See* Compl. ¶¶ 24–25.  As to Moore,

plaintiffs sufficiently allege a causal connection between defendant and the events of October 30,

*see* Compl. ¶ 49, but do not allege sufficient facts to show he caused alleged violations that

occurred on January 29.  Accordingly, plaintiffs' Ralph Act claim against defendants Moore,

Petrino, and Oliver is DIMISSED with leave to amend.

### 2.  Claim 5: Bane Act[15]

Plaintiffs' fifth claim arises under California Civil Code § 52.1 ("Bane Act") and

alleges defendants conduct "constituted interference, and attempted interference, by threats,

intimidation and coercion, with plaintiffs' peaceable exercise and enjoyment of rights . . . ."

Compl. ¶ 86.  "The essence of a Bane Act claim is that the defendant, by the specified improper

means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing

something he or she had the right to do under the law or to force the plaintiff to do something that

he or she was not required to do under the law."  *Meyers v. City of Fresno*, No. CV F 10-2359

LJO SMS, 2011 WL 902115, at *6 (E.D. Cal. Mar. 15, 2011) (quoting *Austin B. v. Escondido

Union School Dist.*, 149 Cal. App. 4th 860, 883 (2007)).

Again, defendants argue plaintiffs Bane Act claim should be dismissed because

plaintiffs have not pled facts to show that defendants threatened violence against them at any

point.  Mot. at 24.  Defendants point out that "mere words, unless they include threats of violence,

are insufficient to support a Bane Act claim."  *Id.* (citing *Shoyoye v. County of Los Angeles,* 203

Cal. App. 4th 947, 959 (2012)).  The Bane Act specifies liability may not be based on "speech

alone" unless "the speech itself threatens violence," *Cuviello v. City of Stockton*, No. CIV. S-07-

---

[15] "(b) If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state . . . . [a]ny individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision [(b)], may institute and prosecute in his or her own name and on his or her own behalf a civil action . . . ."  Cal. Civ. Code § 52.1(b)–(c) (West, 2019).

1625 LKK, 2009 WL 9156144, at *17 (E.D. Cal. Jan. 26, 2009) (citing Cal. Civ. Code § 52.1(j)).

However, California courts remain undecided on whether a Bane Act claim requires a threat of

violence or whether intimidation or coercion involving a nonviolent consequence would suffice.

*See* Judicial Council of California Civil Jury Instruction 3066, Directions for Use (citing *Shoyoye*

203 Cal. App. 4th at 959 (court "need not decide that every plaintiff must allege violence or

threats of violence in order to maintain an action under section 52.1"); *City and Cty. of San*

*Francisco v. Ballard*, 136 Cal. App. 4th 381, 408 (2006) (also noting issue but finding it

unnecessary to address)).

Nonetheless, courts have consistently held that a threat of arrest from law

enforcement can be "coercion" under the Bane Act, even without a threat of violence per se.

*Cuviello v. City of Stockton*, No. CIV. S-07-1625 LKK, 2009 WL 9156144, at *17 (E.D. Cal. Jan.

26, 2009) ("[T]he particular coercive power of law enforcement officers has led courts to impose

liability when detention, rather than violence, is threatened.") (citing *Cole v. Doe*, 387 F. Supp. 2d

1084, 1102 (N.D. Cal. 2005)); *Cuviello v. City & Cty. of San Francisco*, 940 F. Supp. 2d 1071,

1103 (N.D. Cal. 2013) (Bane Act claim based on violation of free speech adequately alleged

where plaintiffs pled defendants "threatened them with arrest" if they protested); *Whitworth v.*

*City of Sonoma*, No. A103342, 2004 WL 2106606, at *6–7 (Cal. Ct. App. Sept. 22, 2004)

(unpublished) (officer's unspoken threat of arrest that prevented plaintiff from entering a meeting

room was sufficient to state a Bane Act claim). Therefore, plaintiffs' claim that defendants

Petrino, Oliver, and Does 31–50 prevented them from entering the courthouse on October 30

while acting in their capacities as sheriff's deputies implies a coercion on the part of the deputies

that is sufficient to state a Bane Act claim at this stage. FAC ¶ 43.

Because defendants' arguments against plaintiffs' Bane Act claim fail as a matter

of law, defendants' motion to dismiss this claim is DENIED as to Does 31–50, and, because the

claim arises out of the October 30 incident, the motion to dismiss is also DENIED as to

defendants Petrino and Oliver. The claim against defendant Moore also survives, but only for

prospective injunctive relief. *See Ex parte Young*, 209 U.S. at 155–56.

/////

24

### 3. Claim 6: Negligence

Finally, plaintiffs' sixth cause of action is for state law negligence.  Compl. ¶ 88. Plaintiffs allege defendants breached their duty of care to plaintiffs "to ensure that defendants did not cause unnecessary or unjustified harm to plaintiffs" and their duty to "hire, train, supervise and discipline SCJSO officers so as to not cause harm to plaintiffs and to prevent violations of plaintiffs' constitutional, statutory and common law rights."  *Id.*

The elements of a negligence claim against a police officer are: "(1) the officer owed plaintiff a duty of care; (2) the officer breached that duty by failing to use such skill, prudence, and diligence as other members of the profession commonly possess; (3) proximate cause between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the officer's negligence."  *Ramos v. Orange Cty. Sheriff's Dep't*, No. SACV131140GHKAJWX, 2014 WL 12575767, at *7 (C.D. Cal. July 25, 2014) (citing *Harris v. Smith*, 157 Cal. App. 3d 100, 104 (1984)).  Defendants argue that plaintiffs fail to plead that defendants' negligence was a proximate cause of an injury to plaintiffs.  Mot. at 25.  The court agrees.  *See* FAC ¶¶ 88–89.  Plaintiffs' claim for negligence is DISMISSED without prejudice.

## VI.  REQUEST FOR JUDICIAL NOTICE

Defendants request that the court take judicial notice of two online news articles that were published in early 2017, both reporting on the subject of public disturbances purportedly caused by BLM and its members.  Req. for Judicial Notice, ECF No. 18.  Because the existence of these articles is not relevant to the issues requiring resolution at this stage of the litigation, the court declines to take judicial notice as requested.  *Ruiz v. City of Santa Maria*, 160 F.3d 543, 548 n.13 (9th Cir.1998) (judicial notice inappropriate where facts to be noticed not relevant to disposition of issues before court).

Defendants' request for judicial notice is DENIED.

## VII.  CONCLUSION

The motion to dismiss is GRANTED in part and DENIED in part as follows:

1. Plaintiffs' claims against San Joaquin County and San Joaquin County Sheriff's Office are DISMISSED with prejudice.

2. All of plaintiffs' claims for damages and declaratory relief against defendant Moore, sued only in his official capacity, are DISMISSED with prejudice.

3. Plaintiffs' Fourteenth Amendment claim against all defendants is DISMISSED with leave to amend.

4. Plaintiffs' Ralph Act claim against defendants Petrino, Oliver, and Moore is DISMISSED with leave to amend.

5. Plaintiffs' negligence claim against all defendants is DISMISSED with leave to amend.

6. Defendants' request for judicial notice is DENIED.

Within 21 days, plaintiffs may file an amended complaint consistent with this order. This order resolves ECF No. 17.

IT IS SO ORDERED.

DATED: July 2, 2019.

_____
UNITED STATES DISTRICT JUDGE